NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0085n.06

**Case No. 15-5364**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Feb 09, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| DEBRA KESSINGER, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: CLAY and ROGERS, Circuit Judges; THAPAR, District Judge.[*]

**CLAY, Circuit Judge.** Defendant Debra Kessinger ("Kessinger") appeals from her conviction for one count of arson in violation of 18 U.S.C. § 844(i) for setting fire to a Dollar General store in Horse Cave, Kentucky. Following a jury trial, Kessinger was found guilty of the arson and sentenced to seventy-two months of imprisonment, plus restitution. On appeal, Kessinger asserts that (1) the district court erred when it ruled that the government would be able to present rebuttal evidence if she argued that the government delayed bringing an indictment against her because it doubted the strength of its case; (2) the district court abused its discretion when it admitted into evidence footage from the store's surveillance system; (3) the district court erred in enhancing her sentence for committing the arson to conceal another offense pursuant to U.S.S.G. § 2K1.4(b)(1); (4) the district court abused its discretion in admitting, as *res gestae*,

---

[*] The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

evidence about the shortfalls in the store's inventory and about her stealing money from the store before the fire; and (5) the district court was required to dismiss two jurors for cause. For the reasons that follow, we **AFFIRM** the district court's judgment and sentence.

## BACKGROUND

On Monday, June 27, 2011 at 7:05 a.m., Kessinger arrived at a Dollar General store in Horse Cave, Kentucky, a store which she managed. Sometime shortly thereafter, Kessinger set fire to the store using fireworks and charcoal. She then walked calmly out of the store through the back door at 7:16 a.m.

The night before Kessinger set fire to the store, she had started putting her plan into action. When she arrived at the store at 6:49 p.m., Kessinger went to her desk in her office where she counted money from the cash register. She then placed the money inside a green bank bag and covered that bag with a newspaper. She also had one of her employees gather loose papers, place them in cardboard boxes, and place those boxes under a table in the store's breakroom. And at some point during the evening, Kessinger grabbed handfuls of fireworks from the store's display cases and brought them to the breakroom. She also was seen pushing a cartful of charcoal towards the direction of the breakroom. Once inside the breakroom, Kessinger placed several bags of fireworks and charcoal into the totes—i.e., large containers for merchandise—that were already there. Kessinger placed these items into the totes in such a way that no one else could see them.

At 9:24 p.m. the same evening, Kessinger turned off the store lights. She then hit a switch which turned the store's surveillance cameras off. At 10:57 p.m., Kessinger set the store's alarm. No one entered the store between the time Kessinger left and the time she returned the next morning at 7:05 a.m.

The following day, Monday, June 27, 2011, two people reported the fire after seeing plumes of smoke coming from the store. Shortly after the fire was reported, the Horse Cave, Munfordville, and Hardyville fire departments arrived to help bring things under control. It took roughly twenty-three firefighters to extinguish the flames.

Kessinger would later tell investigators that on the morning of the fire, she was sitting in her office when she heard a noise coming from the back of the store. Kessinger stated that she then carried with her a sealed cash deposit envelope and placed it under some paper in the breakroom. As she was standing in the breakroom, Kessinger claimed she saw a fireball headed in her direction and then left out the back door, leaving her purse and the cash behind. But the day after the fire, investigators excavated the breakroom and did not find any remains of Kessinger's purse or the sealed deposit. They did, however, find cardboard cores from fireworks and charcoal briquettes.

Because of the fire, the June 29, 2011 scheduled store inventory never took place. On the day of the fire, the store's district managers were scheduled to conduct a pre-inventory—i.e., they were planning to reconcile the store's books, determine what the inventory should be, and count the money in the safe. The Horse Cave store was performing poorly under Kessinger's management—it had shrinkage[1] of close to $100,000. An inventory of the store would have likely triggered an investigation that could have led to Kessinger's being terminated.

We discuss the remaining facts as they pertain to the particular issues on appeal.

---

[1] Shrinkage is when a store has a loss of inventory or fixed assets. (R. 62, Jury Trial Transcript, Volume 3, PageID# 1070-71.)

**DISCUSSION**

I.     **Admission of the Government's Rebuttal Evidence**

A part of Kessinger's defense was that the government delayed seeking an indictment against her because it doubted the strength of its case.  The district court ruled that Kessinger could present this theory to the jury.  But the court ruled that if Kessinger argued this theory, the government would be allowed to rebut it with evidence of its reason for delaying seeking an indictment—i.e., because Kessinger was under investigation for other crimes.  Now on appeal, Kessinger argues that the district court's ruling curtailed her right to present a defense.

Because Kessinger frames this first evidentiary issue as a violation of a constitutional right, we review it *de novo*.[2]  *United States v. Reichert*, 747 F.3d 445, 453 (6th Cir. 2014); *see also United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006) (noting that the abuse of discretion standard generally applicable to a district court's evidentiary rulings is not at odds with *de novo* review of constitutional questions because district courts do "not have the discretion to rest [their] evidentiary decisions on incorrect interpretations of the Constitution") (quotation omitted).

The district court properly ruled that Kessinger would open the door to the government's explanation for waiting to seek an indictment against her if she argued that the reason for the delay was that the government doubted its case.  While criminal defendants have a constitutional right to "'a meaningful opportunity to present a complete defense,'" *Holmes v. South Carolina*,

---

[2] While the government agrees with Kessinger that review is ordinarily *de novo*, it argues that because Kessinger did not object to the district court's ruling during this discussion, plain error review applies.  As we read the record, however, Kessinger did in fact object, albeit couched in slightly different terms.  *See, e.g., United States v. Grissom*, 525 F.3d 691, 695 (9th Cir. 2008) (finding the government's general objection sufficient to preserve a claim because the government "consistently advanced its view" throughout the sentencing hearing and the record indicates that "the district court was indeed fully aware of the government's position").  Therefore, *de novo* review applies.

547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), this right is not unlimited. A defendant "does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Blackwell*, 459 F.3d at 753 (internal citations and quotation marks omitted). Unless the particular rule of evidence "serve[s] no legitimate purpose" or is "disproportionate to the ends that . . . [it is] asserted to promote," a district court's application of the rule to exclude defense evidence will not offend the Constitution. *Holmes*, 547 U.S. at 326. Exclusion of evidence is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citation omitted). Thus, "erroneous evidentiary rulings rarely constitute a violation of a defendant's right to present a defense." *United States v. Hardy*, 586 F.3d 1040, 1044 (6th Cir. 2009) (citation omitted).

Under the circumstances presented here, we have little difficulty concluding that the district court's ruling did not violate Kessinger's right to present a defense. Kessinger essentially argues that the district court should have prevented the government from introducing rebuttal evidence. "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *United States v. Papia*, 560 F.2d 827, 848 (7th Cir. 1977) (citation omitted). "Determining the use and scope of rebuttal evidence lies within the broad discretion of the district court." *United States v. Levy*, 904 F.2d 1026, 1031 (6th Cir. 1990).

The government's position at trial was that it should be allowed to present evidence contradicting any theory that it delayed seeking an indictment for the reason that it doubted its case against Kessinger. Kessinger points to no rule, and no rule can be found, that allows a defendant to preempt a prosecutor's right to present rebuttal evidence. More importantly,

though, the district court's evidentiary ruling did not cause Kessinger constitutional injury because it did not prevent her from raising a defense that the government had doubts about its case. A variety of avenues were available to Kessinger to present this defense. The district court never ruled that Kessinger could not present her evidence or argue this theory. It was Kessinger's strategic decision, rather than the district court's evidentiary ruling, that caused her not to present this defense. We therefore find no error in this ruling.

## II.    Admission of the Footage from the Store's Surveillance System

At trial, the government called Joseph Wagner, an employee of Integrated Security Solutions,[3] to testify about the Dollar General store's surveillance security system. Through Wagner, the government introduced into evidence surveillance footage from the store's security cameras. The footage was burned onto DVDs. Kessinger objected to the introduction of the DVDs on the ground that they were not properly authenticated. Specifically, she argued that the government did not lay a foundation for the date and time shown on the DVDs. The district court then instructed the government to ask Wagner whether the date and time shown on the DVDs was accurate, and if so, how he knew. The government asked Wagner to explain how the date and time are displayed on the DVDs. Wagner gave the following explanation:

Q [government]:    And as far as the security footage that [the DVR system] captures, does it collect a time and date of the video footage that it collects?

A [Wagner]:    Yes.

Q [government]:    And how does it do that? Well, not technically, but it does that on the disks -- or on the footage that it's capturing on the DVR?

---

[3] Integrated Security Solutions provided video surveillance systems to the Dollar General store.

> A [Wagner]: When the DVR is set up, you set a time and date within the software.
>
> Q [government]: Yes, sir.
>
> A [Wagner]: And then it uses that time and date. As information's coming in -- as video is coming into the hard drive, it marries the date and time together.
>
> Q [government]: And based on the DVR coming from Central Time Zone, what time would it have on those video footage that's collected?
>
> A [Wagner]: The DVR would be set to Central Time Zone, so that would be the time that it has.

(R. 31, Testimony of Joseph Wagner from Jury Trial, PageID# 192.)

The court then overruled Kessinger's objection and admitted the DVDs into evidence. Now on appeal, Kessinger argues that this evidence was erroneously admitted because the DVDs had not been authenticated under Federal Rule of Evidence 901. We disagree.

When a defendant challenges a district court's evidentiary ruling, we review that ruling for abuse of discretion. *United States v. Chalmers*, 554 F. App'x 440, 449 (6th Cir. 2014). "We will not reverse unless an error affects a substantial right—that is, if the error had a substantial and injurious effect or influence on the jury's verdict." *United States v. Shannon*, 803 F.3d 778, 785 (6th Cir. 2015).

Because the DVDs were properly authenticated by a witness with knowledge, as required by Rule 901 of the Federal Rules of Evidence, there was no abuse of discretion in their admission. The Federal Rules of Evidence allow parties to authenticate evidence in any way that presents "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). A party may authenticate evidence through "[t]estimony [of a witness with knowledge] that a matter is what it is claimed to be." Fed. R. Evid. 901(b)(1). The

7

Advisory Notes to Rule 901(b)(4), which provide that evidence may be authenticated by distinctive characteristics, state: "The characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety."

While the exact nature of Kessinger's argument is difficult to ascertain, she seems to contend that Wagner is not the proper foundation witness. However, we find otherwise. Wagner identified the DVDs as a recording of the store's surveillance system. He testified that the DVDs were an accurate recording of the video footage and, based on his personal knowledge, explained how the time and date are displayed. This was sufficient to authenticate the DVDs under Rule 901(b). *See, e.g., Buziashvili v. Inman*, 106 F.3d 709, 717 (6th Cir. 1997) ("[T]he W-2 forms were sufficiently authenticated in that they appeared to be what they purported to be, and defense counsel was not able to make any serious challenge to their authenticity."); *United States v. Kandiel*, 865 F.2d 967, 973-74 (8th Cir. 1989) (tape recordings were authenticated without evidence of origin, method, or time of recording).

Kessinger claims that this testimony is not sufficient because the person who installed the surveillance system did not testify and that the date and time may be formatted incorrectly. This argument, however, does not implicate the DVDs' admissibility but instead goes to the weight that should be attributed to them. *United States v. Allen*, 106 F.3d 695, 700 (6th Cir. 1997). The district court therefore did not abuse its discretion in admitting the DVDs into evidence.

## III.     Application of U.S.S.G. § 2K1.4(b)(1)

At sentencing, Kessinger objected to a two-level enhancement pursuant to U.S.S.G. § 2K1.4(b)(1) for committing the arson to conceal another offense. In support of this enhancement, the government called to testify Phillip Bramlett, a regional loss prevention

manager at Dollar General, and also Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Kurt Meuris.

Bramlett testified that in August 2010, he was notified of a $700 discrepancy in one of Kessinger's deposits. Dollar General then notified Kessinger that it was aware of the $700 shortage. Bramlett traveled to the Horse Cave store to investigate the shortage. When he met with Kessinger, Kessinger immediately stated that she found the money in a ledger book she kept in the office. Bramlett questioned Kessinger why she kept a separate ledger. Bramlett informed Kessinger that keeping a second ledger was against company policy, as doing so made it easier to cook the books, i.e., to use receipts from one day to cover money missing from another day. He then threw Kessinger's ledger in the trash.

For his part, Agent Meuris testified that after the fire, several of Dollar General's district managers completed an inventory of the store's safes. The inventory revealed that between $1,700 and $2,200 was missing. Agent Meuris testified that evidence showed that Kessinger was responsible for the cash being missing from the store. Namely, video surveillance footage showed Kessinger putting money into a bank bag and concealing the bag under newspapers. And while Kessinger told investigators that she left the bag behind in the breakroom, investigators found no evidence of the bag or the money.

The district court found that Bramlett's and Agent Meuris' testimony established, by a preponderance of the evidence, that Kessinger had stolen money from the store during her tenure as manager—namely, $700 in July 2010 and between $1,700 and $2,200 the night before the fire. Based on this testimony, the court found that the evidence sufficiently established that Kessinger committed the arson to cover up prior thefts. The court summarized its ruling in this way:

> Well, it's a preponderance standard and I think that all of these -- this evidence, [defense counsel], you know, the $700, and the existence of the ledger, and her use of the ledger all allows a reasonable fact finder to draw inferences. And this is certainly one of those cases where inferences can be drawn reasonably, the lack of a recovery of bank bag zipper, whatever.

> I certainly think that this is not the only reason that she burnt the store down, but I think it's part of the reason. I think there's sufficient evidence to believe that she was taking money, had taken money, was trying to cover up the fact that she was taking money from the store, and that this was part of the reason that she committed this offense. So I think that the two-level enhancement does apply.

(R. 68, Sentencing Hearing, PageID# 1538-39).

After applying the two-level enhancement under U.S.S.G. § 2K1.4(b)(1), which resulted in a sentencing range of sixty-three to seventy-eight months, the court sentenced Kessinger to seventy-two months of imprisonment, plus restitution. Kessinger now challenges that sentence, arguing that the evidence failed to show that she committed the arson to cover up prior thefts.

"We review a sentence imposed by the district court for reasonableness." *United States v. Webb*, 616 F.3d 605, 608-09 (6th Cir. 2010) (citing *United States v. Richardson*, 437 F.3d 550, 553 (6th Cir. 2006)). Generally, the reasonableness of a sentence is reviewed for abuse of discretion. *Id.* at 609. But where the defendant challenges the application of a sentencing enhancement, we review for clear error. *United States v. Moore*, 225 F.3d 637, 642 (6th Cir. 2000). A factual finding is clearly erroneous when, "though there is evidence to support that finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Ables*, 167 F.3d 1021, 1035 (6th Cir. 1999) (internal citations and quotation marks omitted).

The enhancement at issue, § 2K1.4(b)(1), provides for a two-level increase to a defendant's offense level for the offense of arson if "the offense was committed to conceal another offense[.]" U.S.S.G. § 2K1.4(b)(1). The government bears the burden of proving by a

preponderance of the evidence that the enhancement applies. *United States v. Gibson*, 985 F.2d 860, 866 (6th Cir. 1993).

In light of the testimony at trial and at the sentencing hearing, the district court's determination that the two-level enhancement applied was not clearly erroneous. The district court explicitly rejected Kessinger's argument that there was not sufficient proof to establish the fact that she stole cash from her store. The court specifically pointed to the fact that video surveillance footage showed Kessinger putting money into a bank bag and concealing the bag under newspapers. The court also pointed to the fact that Kessinger was implicated in an internal investigation over a $700 discrepancy in one of her deposits. And the court took note of the fact that Kessinger kept a separate ledger, which made it likely that she was using receipts from one day to cover money missing from another day.

All of this evidence—i.e., the evidence presented at trial and at sentencing—provided a sufficient basis for the district court to find by a preponderance of the evidence that Kessinger set fire to the store to cover up her prior thefts. After reviewing all of the evidence, we are not left with a definite and firm conviction that the district court made a mistake. We therefore affirm Kessinger's sentence.

**IV.    Admission of Evidence Regarding Kessinger's Stealing Money and Merchandise from the Store and the Store's Inventory Losses during Kessinger's Tenure as Manager**

In pretrial proceedings, the government attempted to introduce evidence regarding Kessinger's stealing money and merchandise from the store and the store's inventory losses during Kessinger's tenure as manager. The government argued that this evidence was *res gestae*. Kessinger opposed the evidence's admission. The district court held that evidence of the store's inventory losses was *res gestae* and was admissible to show Kessinger's motive for setting fire to

the store. However, with regard to Kessinger's thefts, the court limited the proof to only those thefts close in time to the fire. Kessinger now argues that this ruling was an abuse of discretion.

When a defendant challenges a district court's evidentiary ruling, we review that ruling for abuse of discretion. *Chalmers*, 554 F. App'x at 449. If evidence was erroneously admitted, we ask whether the admission was harmless error or requires reversal of a conviction. *United States v. Martinez*, 588 F.3d 301, 312 (6th Cir. 2009).

"We have recognized the admissibility of *res gestae*, or background evidence, in limited circumstances when the evidence includes conduct that is 'inextricably intertwined' with the charged offense." *United States v. Clay*, 667 F.3d 689, 697 (6th Cir. 2012) (citing *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000)). "Proper background evidence has a causal, temporal or spatial connection with the charged offense." *Hardy*, 228 F.3d at 748. "[Such] evidence may include evidence that is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of the witness's testimony, or completes the story of the charged offense." *United States v. Grooms*, 566 F. App'x 485, 491 (6th Cir. 2014) (internal quotation marks omitted).

*Res gestae* is often called "intrinsic evidence." "Intrinsic acts are those that are inextricably intertwined with the criminal act charged or a part of the criminal activity as opposed to extrinsic acts, which are those that occurred at different times and under different circumstances from the offense charged." *United States v. Stafford*, 198 F.3d 248, at *4 (6th Cir. 1999) (unpublished table opinion). We have "acknowledge[d] that the distinctions among *res gestae*, inextricably intertwined evidence, intrinsic evidence, and background evidence [are] far from clear." *United States v. Adams*, 722 F.3d 788, 822 n.26 (6th Cir. 2013). However, we treat these various concepts similarly. *See id.*

*Res gestae* does not implicate Federal Rule of Evidence 404(b), which prohibits evidence of past acts to prove character, although there are some exceptions. *Hardy*, 228 F.3d at 748. For example, "[w]e allow the trial court to admit evidence regarding a defendant's unindicted criminal activity when that activity is 'intrinsic' or 'inextricably intertwined' with charges named in the indictment." *United States v. Potts*, 173 F.3d 430, 1999 WL 96756 at *9 (6th Cir. 1999) (unpublished). Even if evidence is *res gestae*, "[w]e must also find that the district court did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice pursuant to Federal Rule of Evidence 403." *United States v. Joseph*, 270 F. App'x 399, 405 (6th Cir. 2008).

While Kessinger objects to the district court's admission of several pieces of evidence—namely her stealing money from the store before the fire and the store's inventory losses during her tenure as manager—the district court properly admitted all of these facts as evidence of the crime charged. The purpose for the introduction of this evidence was to establish motive. The government had the right to argue that Kessinger set fire to the store because an inventory of the store—which was supposed to take place just two days after the fire—would have likely triggered an investigation that could have led to Kessinger's being terminated. Indeed, under Kessinger's management, the store had inventory losses of close to $100,000.

The government's theory of the case was simple: Kessinger set fire to the store to cover up the fact that under her management, the store had high inventory losses. This evidence was *res gestae* because it was "closely related in both time and nature to the crime charged." *United States v. Vincent*, 681 F.2d 462, 465 (6th Cir. 1982) (internal quotation marks omitted). In ruling that this evidence was admissible, the district court correctly concluded that the probative value of the evidence was not outweighed by unfair prejudice.

Moreover, while Kessinger claims that the district court erred by admitting "prior bad acts," this argument likewise fails because the evidence was not within the scope of Fed. R. Evid. 404(b). As discussed above, Rule 404(b) does not apply when "the challenged evidence is 'inextricably intertwined' with evidence of the crime charged," *United States v. Everett*, 270 F.3d 986, 992 (6th Cir. 2001), or when the acts are "intrinsic" or "part of a continuing pattern of illegal activity." *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995). Because the evidence directly addressed charges in the indictment with which Kessinger was found guilty, Rule 404(b) does not apply.

But even if Rule 404(b) should have been applied as Kessinger argues, the evidence of "other bad acts" would still have been admissible because this evidence was relevant, used for a proper purpose, and not "substantially more unfairly prejudicial than probative," under Fed. R. Evid. 403. *United States v. Stout*, 509 F.3d 796, 799 (6th Cir. 2007). For the reasons discussed above, the evidence Kessinger disputes was highly relevant to this case and probative of her intent. Kessinger makes no substantive argument that she was unfairly prejudiced as a result of its admission. It is therefore unlikely that the jury was unfairly swayed or that it convicted Kessinger on the basis of this evidence alone. *See United States v. Henderson*, 626 F.3d 326, 339 (6th Cir. 2010). Because the district court did not abuse its discretion in admitting the *res gestae* evidence, reversal is unwarranted.

## V. The District Court's Failure to Dismiss Two Jurors for Cause

During voir dire, one of the jurors, identified as Juror No. 8, announced that he knew one of the potential witnesses, ATF Special Agent David Hayes. Juror No. 8 said that he "would trust [Hayes'] word more than [he] would a stranger's." (R. 60, Jury Trial Transcript, Volume 1, PageID# 505.) The following colloquy then took place:

14

Q [court]:     All right.  So if it came down to it, it would mean more that you know him than what he necessarily said?

A [juror]:     You'd have to take both things together.

Q [court]:     Right.  Okay.  So my question was: you do know him, you like him, you trust him generally, but if he said something that made you question whether he was right on the topic, could you, would you question him?

A [juror]:     Honestly, yes.  Yeah, I could question him.

Q [court]:     And you wouldn't just automatically accept what he's saying to you just because you know him?

A [juror]:     No.

(*Id.* at 505-06.)

The district court denied Kessinger's motion to strike Juror No. 8 for cause.  Another juror, identified as Juror No. 14, announced that he had been the victim of an unsolved burglary, and as a result, questioned whether he could be fair because of his bitterness over the fact that no one was ever prosecuted.  The court asked a series of follow-up questions regarding why the juror's bitterness would have anything to do with Kessinger's presumption of innocence.  Juror No. 14 ultimately agreed that Kessinger was innocent until proven guilty.  Juror No. 14 then informed the court that he needed to pick his daughter up from college the following Tuesday.  The district court denied Kessinger's motion to strike Juror No. 14 for cause.

Nonetheless, Kessinger used her peremptory challenges to excuse the prospective jurors in question—i.e., Juror Nos. 8 and 14—so neither actually sat on her jury.  She now argues on appeal that the district court should have removed them for cause rather than force her to use up two of her peremptory challenges.

Even if we were to assume that the district court should have dismissed these jurors for cause—a conclusion that is at odds with the record and applicable case law, *see Miller v.*

15

*Francis*, 269 F.3d 609, 618-19 (6th Cir. 2001) (holding that "the trial court cannot be faulted for not disqualifying for cause a juror who consistently says that she thinks she can be fair")—there is no legal basis for Kessinger's impartial jury claim.

Kessinger's claim that the district court violated her constitutional rights is foreclosed by *United States v. Martinez-Salazar*, 528 U.S. 304, 317 (2000), which held that "a defendant's exercise of peremptory challenges . . . is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." Kessinger, like Martinez-Salazar, "had the option of letting [each allegedly biased potential juror] sit on the petit jury and, upon conviction, pursu[e] a Sixth Amendment challenge on appeal." *Id.* at 315. But instead, Kessinger, like Martinez-Salazar, elected to remove the two jurors because she did not want them on the jury. *See id*.

Kessinger concedes that her argument is foreclosed by *Martinez-Salazar*, and raised the argument only to preserve it for further review by the Supreme Court. *Martinez-Salazar*, which remains controlling law, does in fact foreclose Kessinger's claim.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment and sentence.